UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
CARLOS SAMPER,                              :
                                            :
                    Petitioner,             :
     -against-                               :         **OPINION AND ORDER**
                                            :         **DENYING HABEAS**
                                            :         **CORPUS**
CHARLES GREINER, Superintendent,            :
Sing Sing Correctional Facility,            :
                                            :         00 Civ. 1401 (AKH)
                    Respondent.             :
------------------------------------------------------------x

ALVIN K. HELLERSTEIN, U.S.D.J.:

Petitioner was convicted of murder in the second degree after trial before a court and jury and by judgment of the Supreme Court, New York County, filed February 23, 1993. The murder had occurred on the streets of Washington Heights, in Manhattan, in the early morning hours of July 26, 1990. Petitioner is serving an indeterminate term of twenty-five years to life.

All post-conviction procedures granted by the laws of New York State have been exhausted. By Opinion and Order filed March 1, 2002, I denied the petition for a writ of habeas corpus. Samper v. Greiner, No. 00 CIV. 1401(AKH), 2002 WL 334466 (S.D.N.Y. Mar. 1, 2002). The Second Circuit limited appeal to the issue of the constitutional adequacy of trial counsel's representation, vacated the judgment I had entered and remanded for further factual development consistent with its rulings. Id., 74 Fed. Appx. 79, 2003 WL 21938757 (2d Cir. Aug. 13, 2003.)

Following issuance of the Mandate, I appointed CJA-qualified counsel. However, Petitioner's family asked that he be represented by Eleanor Jackson Piel, Esquire, and I granted the request. Ms. Piel, with characteristic zeal, has represented her client ably and

1

indefatigably, presenting affidavits, calling witnesses over three sessions, and successfully contending for a telephone deposition of a material witness sworn in Colombia and questioned and transcribed from New York, New York, the transcript of which has been filed. Ms. Piel, and the Assistant District Attorney, Susan Axelrod, Esquire, have now filed their briefs, and I have fully considered their arguments and the record.

I hold that the determination of the New York State courts did not involve "an unreasonable application of…clearly established Federal law," in that Petitioner did not satisfy his burden to show that his trial counsel failed to provide a constitutionally adequate defense. See 28 U.S.C. § 2254(d); Strickland v. Washington, 466 U.S. 668 (1984). I believe, and I therefore find, that it is not reasonably probable that presentation of the alibi witnesses or two additional witnesses would have changed the jury's verdict.

The Facts of Record

Humberto Valdez was shot and killed in cold blood at approximately 1:45 a.m. on July 26, 1990 on St. Nicholas Avenue, between 184th and 185th Streets. He had just exited the El Baturro nightclub, where he was a bodyguard and supplier of drugs to one of the owners. He was with two other men, Boulevard[1] Pena and the club bouncer, Antonio. Pena supplied drugs to Valdez and lived with Valdez and his wife and two daughters.

Valdez was shot with a .45 pistol, twice in the head, both at very close range. The gunman appeared from behind a van across the street, approached Valdez, avoided

---

[1] Pena's first name is variously identified as both "Boulevard" and "Bolivar" throughout the record.

Valdez's efforts to wrestle away the gun and dodge the bullets, shot Valdez, and fled the scene. Pena also had fled, but identified Petitioner, Samper, as the killer. The only other eyewitness was Denise Valdez.

Denise Valdez was the daughter of the slain man, and Pena's friend, perhaps an intimate friend. She had gone to the club that night with her father and Pena. She had taken heroin a little earlier, and Pena had had drinks. Just before the shooting, she had left the club to use a nearby street telephone to call a friend, but claimed at trial to have seen the shooting and to have recognized Samper, first in the club, then outside the club pointing his gun at her father, wrestling to keep possession of it, and killing her father. She claimed also to have seen an employee of the club, Arturo Soriano, come out of the club, hit her father from the rear, and enable Samper to kill him. Soriano and Samper drove away together. Pena, on the other hand, although testifying that Humberto Valdez (the slain man), Antonio (one of the club bouncers), and he were engaged in a conversation; that "Humberto was on my right, leaning on the same car that I was leaning [on] also"; and that he saw in detail Humberto's struggling motions with Petitioner over the gun, claimed not to "recall" whether anyone else, including presumably Soriano, was around.[2]

Denise Valdez left the scene, raced home in a taxicab, obtained her own gun, and sought to locate Samper while driving through the neighborhood streets in the company of her mother and sister and a friend. She intended to kill Samper if she found him.

Pena stayed in the Valdez apartment, called "911," and gave a vague and general description of the assailant. Denise Valdez also declined to identify the assailant, even to

---

[2] Tr. of Trial, Feb. 2-3, 1993, at 323, 330, 401. This inconsistency, as to what he recalled and could not recall, was highlighted in the defense summation. Id., Feb. 8, 1993, at 770.

3

her mother. Pena also declined to tell the police that he had been with Denise Valdez in the club immediately before the shooting.

By the time of trial, the police and Assistant District Attorney had won over Pena's and Denise Valdez's reluctance, and both testified that Samper was the assailant. The motivations of both were suspect, and their credibility, compromised. Denise Valdez had a record of two prior felony narcotics convictions in New York, and a ten-year unserved probationary term in Texas for a narcotics conviction in that State, and had solicited help from New York City detectives and the Assistant District Attorney to alleviate her problems. Pena persisted in being unable to identify Samper through several line-ups and photo-sessions, even though he later claimed that he was able to identify him all along, declining to do so because of fear for his own safety. Finally, Pena was won over by the promise of an Assistant District Attorney to allay concerns about safety and to help Pena avoid deportation. Pena declined Samper's telephone offers of financial help and legal assistance with immigration if he persisted in not identifying him. But Pena and Denise Valdez continued to waver, and it took a threat of perjury and payments of $4,000 to $5,000 by the District Attorney's office and an offer of a free airplane ride to Santo Domingo before Pena agreed to be a witness for the prosecution. Pena also had outstanding bench warrants issued against him, and he benefited in the punishment he received by interventions by the Assistant District Attorney and by $5 placed in his commissary account. And Pena was given a two-week, expense-paid stay in New York during the Samper trial.

Samper's trial lawyer effectively impeached Pena and Denise Valdez with all this, and more, information, and effectively argued to the jury that their testimony lacked

4

credibility. My earlier opinion, and that of the Court of Appeals, described and noted the jury's concerns about the credibility of the prosecution's witnesses and the issue of reasonable doubt thereby raised. The jurors had to reason their way through the potential of deadlock, and were guided by an Allen charge, Allen v. United States, 164 U.S. 492 (1896), before coming to a unanimous verdict of guilty.

Impeachments and Alibis

Samper's trial counsel was aware that Pena and Denise Valdez had expressed positions that were inconsistent with their trial testimony, and had tried to place themselves elsewhere. One of the lawyers who had initially been assigned to defend Samper, Michael Rodi, Esquire, of the Legal Aid Society, had initiated efforts to meet with Denise Valdez after Ms. Valdez told Rodi over the telephone that she had been mistaken in her identification of Samper as the killer, and in referring to Samper as "Carlos" and "Boriquito" ("little Porto Rican"). However, she refused to see Rodi when he came to interview her in jail. Another witness, Elba Valdez, Denise Valdez's sister, told Rodi that Denise, Elba and Pena had driven to the nightclub together on the night of the homicide, and claimed that Denise had not gone inside the club. Pena claimed that he did not know Carlos, and that the District Attorney was prosecuting the wrong man, but he admitted to knowing "Boriquita." But Pena also told an investigator hired by defense counsel just before trial, Jessie Franklin, that he (Pena) admitted to having dinner in the nightclub that night with Denise, but that Denise had left before the shooting and told Pena that she did not know who did it.

All these admissions, assertions, and counter-assertions raised questions about the integrity of the evidence. In addition, a suggestion of an alibi defense was presented to defense counsel. In October 1991, a year-and-a-half after the murder and before the trial, Delia Ospina, Gloria Ospina, and Luis Fernando Ospina made notarized statements avowing that Samper had spent the night of July 25-26, 1990 with them in their apartment. Defense Counsel Michael Rodi was aware of those statements, but apparently did not have much confidence in the credibility of the Ospinas, or so Jaffe said Rodi told him.

When Robert Jaffe entered the case as Samper's defense counsel, succeeding Michael Rodi, Jaffe had his investigator, Franklin, interview the witnesses. She interviewed Pena, and learned of the contradictions in his several accounts of the events of the evening of July 25-26, 1990, discussed above. She also interviewed Maria Torres, Denise Valdez's aunt. And she interviewed the Ospinas with respect to the issue of alibi. Franklin's reports to Jaffe, confirmed by Jaffe's talks with the Assistant District Attorney responsible for the prosecution, caused Jaffe to question the efficacy of the alibi witnesses. However, Jaffe complained to the trial judge that the prosecution and police were pressuring the Ospinas against testifying, and he caused the Ospinas to be present at the trial, ready to be called to testify. Clearly, Jaffe knew that the Ospinas were available to testify that Petitioner had spent the night with them and, therefore, could not have been present at the scene of the crime. But, just as clearly, Jaffe lacked confidence in the credibility of the Ospinas, and did not call them to the witness stand, choosing to rely on his cross-examinations of the alleged eyewitnesses, Denise Valdez and Boulevard Pena.

His decision, he testified in the evidentiary hearing before me, reflected twenty years of trial experience prior to Petitioner's trial, and another ten years since.

Trial lawyers have a serious dilemma in circumstances such as these. The standard of reasonable doubt, applied to shaky prosecution witnesses, may be compromised if one's own witnesses also are shaky. Trial lawyers then become concerned that juries come to judgments on the basis of relative credibility of witnesses, rather than the doubt that can arise from judging the prosecution's witnesses' credibility in isolation. Logically, one might think that an alibi witness should increase doubt; experientially, trial lawyers are likely to believe the contrary. See, e.g., F. Lee Bailey & Kenneth J. Fishman, Criminal Trial Techniques § 32:19 (2004) ("Tactically, the defense of alibi is both the best and worst of defenses. The disinterested alibi witness who can withstand cross-examination unimpeached can bring certain acquittal. On the other hand, the alibi witness who is proven a liar can destroy the effectiveness of your defense."). Thus, unless alibi witnesses are strong and corroborative proofs support their assertions, experienced defense counsel may eschew potentials of alibi proofs for fear that juries may assess relative credibility rather than reasonable doubt.

Jaffe's cross-examinations of Denise Valdez and Boulevard Pena raised substantial doubt as to the credibility of the prosecution's witnesses, troubling the jury until an Allen charge enabled the jurors to come to a unanimous verdict. The decision of defense counsel Jaffe not to call the Ospinas, even though they had come to court to await the possibility of being called as witnesses, was therefore understandable in the context of Jaffe's trial strategy.

## The Evidentiary Hearing Following Remand

Following the remand from the Court of Appeals, Samper's retained counsel presented affidavits and called witnesses. I heard their testimony, and received documentary evidence, in three sessions, according to the readiness of petitioner's counsel: March 15, 2004; April 15, 2004, and October 4, 2004. In addition, and over the District Attorney's objection, I allowed Petitioner to take the testimony of a witness, Delia Ospina, by a cross-border deposition on January 12, 2005, with questioning and transcription taking place in New York, and oath-taking, interpreting, and answering taking place in Colombia.

## The Ospinas: Petitioner's Alibi Witnesses

The affidavits of Delia Ospina, Luis Fernando Ospina, and Gloria Bonilla Ospina stated that Petitioner was at their home the entire day of July 25, 1990 and through the morning of July 26, 1990. Defense counsel Jaffe had those affidavits before trial, and complained to the Assistant District Attorney and to the trial court that successive visits and advisory comments by the police investigators threatened those witnesses and were improper efforts to prevent them from testifying. Nevertheless, Jaffe declined to call those witnesses. He explained that he was concerned that they would not be credible witnesses. He was influenced by the comment of the Assistant District Attorney that they had given contradictory statements to his police investigators, the view of predecessor counsel, the evaluation of Jessie Franklin, Jaffe's investigator, and Jaffe's own hesitations as an experienced trial lawyer with respect to uncorroborated and weak testimony of alibi witnesses generally.

At the hearing before me, attorney Michael Rodi had only scant memory of any of the details of the case. Jaffe, when he succeeded to the representation, engaged Jessie Franklin to investigate the alibi evidence and, Jaffe testified, investigator Franklin reported to him her misgivings about the credibility of the alibi witnesses. However, Jaffe did not have a note recording the conversation. Clearly, Jaffe kept his options open, because he had the Ospinas adjacent to the courtroom, ready to testify, if Jaffe decided to call them.

Jessie Franklin testified in the evidentiary hearing and identified the memorandum that she had prepared summarizing her investigation. But she had no independent recollection of her knowledge or of her conversations with Jaffe, and did not remember that there were alibi witnesses, or that she interviewed them.

Luis Fernando Ospina and Gloria Bonilla Ospina, despite having given affidavits to Petitioner's trial counsel, were unwilling to testify at the evidentiary hearing. Delia Ospina testified, but from Colombia. I allowed the testimony, notwithstanding the inability to view demeanor evidence, and over the objection of the District Attorney.

Delia Ospina testified that Petitioner lived in the apartment at 2851 Barker Avenue in the Bronx that she shared with her daughter and brother, and that Petitioner was in the apartment all day on July 25, 1990, and until 8:30 a.m. on July 26th. She testified that he could not have left during the night because he didn't have a key and because the Ospinas' dog would have barked. On cross-examination, Ms. Ospina admitted that she was in the United States illegally, that her brother was in jail, and that her daughter lived in Spain. Ms. Ospina was married, and lived in the bedroom of the apartment with her husband. Her niece had introduced her to Petitioner, and Petitioner

moved into the apartment when he was paroled from jail in July of 1989 and continued living there until September 1990, a period of a year and a half. The apartment consisted of a bedroom, a living room, a kitchen, and a small hallway. Presumably, Ms. Ospina's daughter and brother shared the living room. The record does not disclose where in the apartment Petitioner was said to have lived. Ospina testified that Petitioner and her brother spent the night "[i]n the room" in the apartment. Tr. of Dep. of Delia Ospina, Jan. 12, 2005, at 11. The daughter's place in the apartment was not mentioned.

Ospina testified at her deposition that Petitioner arrived at the apartment at around 2:30 p.m. on July 25, and left at around 8:30 a.m. the next morning. Ospina testified that she and her husband went to bed at 11:30 p.m., and got up at 6:00 a.m. Petitioner attended Hostos Community College, did not have a job, and helped her occasionally in her $400 a month rent obligation. Ospina worked as a day laborer, cleaning apartments and offices, and was paid $50 or $60 per day. Ospina said that she had asked Petitioner to look for a job but, it seems, without outcome, and Petitioner "didn't have any money [to pay her rent] because he didn't have a job." Id. at 27. She and Petitioner were friends, not "fairly good friends," id. at 21, and Petitioner was present the night of July 25 at a get-together of the Ospinas, to celebrate the birthday of her daughter's boyfriend. It seems, however, that the boyfriend was not there; only the alibi witnesses -- Ospina, Ospina's brother, Ospina's daughter -- and Petitioner were there, not Ospina's husband, and not Ospina's daughter's boyfriend. But none of this is very clear.

Ospina stated that the affidavit that she gave originally was given to her to sign by Petitioner's privately retained lawyer, who promised also to give her immigration and other help, and that the District Attorney's investigator visited her several times after that.

As to the affidavit she signed on August 27, 2004, for use in the proceedings before me, Ospina testified that she signed the affidavit that Petitioner sent her, in English, presumably without understanding its details because she spoke Spanish, not English, and her testimony at the deposition was given through an interpreter. Finally, Ospina stated that she had no recollection of having been interviewed by Jaffe or by an investigator who worked for Jaffe.

The testimony by Delia Ospina confirms Jaffe's hesitation to call the Ospinas as witnesses. A jury easily could be skeptical whether, in truth, Petitioner had stayed from 2:30 p.m. to 8:30 a.m. without ever leaving the small apartment. No details regarding activities, conversations, or whereabouts are provided to corroborate Delia Ospina's conclusory statements. Ospina's daughter and brother apparently were at the birthday party, but not the daughter's boyfriend, whose birthday it was. Ospina slept in the bedroom of the apartment with her husband who, we may infer, arrived without notice sometime after the party. This left only the living room, presumably the place of the party, for sleeping, and presumably the brother and Petitioner slept there, but it is far from clear. And when did the daughter leave? Ospina said she awoke at 6:00 a.m. on July 26th, but said nothing about Petitioner's whereabouts: only that he left around 8:30 a.m. Clearly, in the small apartment, Ospina would have had to have seen who was sleeping where.

Of course, the prosecution has the burden of proof beyond a reasonable doubt to disprove the alibi and to place Petitioner at the scene and as the killer. Jaffe's point was that, as a matter of defense counsel's trial strategy, he chose to place his emphasis on his impeachments of the prosecutor's witnesses, and not on unreliable alibi witnesses.

11

Whether Jaffe could have done more to account for his strategy, or have spent more time interviewing potential witnesses (at less than reasonable New York State "18-b" rates), or documenting his strategy decisions, is not the point. The issue is whether or not Jaffe's representation was constitutionally inadequate, and whether the state court, in refusing so to find, unreasonably applied the standards of <u>Strickland</u>, whether, that is, the decision of the State court "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." <u>See</u> 28 U.S.C. § 2254(d). I am unable so to find.

<u>The Witnesses Maria Torres and Arturo Soriano</u>

Denise Valdez's trial testimony placed Arturo Soriano at the scene of the killing of Humberto Valdez, as an accomplice, hitting Valdez from the rear as Valdez wrestled Petitioner for control of Petitioner's gun, and driving away with Petitioner. Soriano later gave a statement, denying that he was outside the nightclub at the scene of the killing, and claiming that he was at all times inside, presumably at the bar. Petitioner claims that Jaffe did not interview Soriano, directly or through his investigator. The claim suggests that Soriano's testimony would have helped the jury to find a reasonable doubt in the prosecution's case against Petitioner.

Jaffe testified that he did not recall having seen a statement by Soriano before the trial; having spoken to Soriano; or having asked his investigator, Franklin, to speak to him. It is not probable, however, that Soriano's testimony would have made a difference in the jury's verdict. Soriano appears to have been one of the bouncers at El Baturro. He was also identified as having served as an accomplice to Petitioner. Clearly, his

statement to the Assistant District Attorney that he knew nothing of the killing and was inside the Club rather than on the sidewalk was self-serving. Soriano would have been subjected to vigorous impeachment had he testified, and his credibility probably would have been in doubt.

Maria Torres supposedly would have testified, if she had been called, that Denise Valdez, her niece, told her that she really didn't believe that Petitioner committed the murder, but testified in that fashion only because her mother told her to do so. Torres claimed also that she resisted pressure by the Assistant District Attorney to cause her also to accuse Petitioner of having been the killer. As corroborating evidence, Petitioner presented Denise Valdez as a witness, to confirm that she did not know Petitioner, and to recant her eyewitness testimony at the trial. Denise Valdez, eleven years later, testified that she was high on drugs on the night of July 25, 1990, so much so that, as she put it, she "was just thinking about drugs, drugs" and she "didn't see who" shot her father. Tr. of Evidentiary Hr'g, Mar. 15, 2004, at 16-17.[3]

Jaffe testified that he could not recall having heard before trial about Maria Torres. Nevertheless, it is highly doubtful that Jaffe would have called her as a witness, even if he had known about her. Jaffe's cross-examination of Denise Valdez brought out her testimonial inconsistencies and contradictions. Why would he want to present a

---

[3] Petitioner argued that Jaffe failed to impeach Denise Valdez on her motive. This is not true as a point of fact, see Tr. of Trial, Feb. 2, 1993, at 227-29 & 238-46; see also id. at 229-33 (colloquy with the trial court in which Jaffe expressly revealed his thesis that it was self-interest that prompted Denise Valdez to contact Det. Morales about the circumstances surrounding the murder, an "important" point he would try to elicit on cross-examination). Petitioner spent considerable time in cross-examining Denise Valdez's credibility from a number of perspectives, including that she was high from narcotics and seeking to get even with her father's alleged killer. See, e.g., id. at 213, 254, 268.

13

collateral witness to make the same point—assuming that the trial judge would have allowed the collateral witness to testify, see, e.g., People v. Delacruz, 714 N.Y.S.2d 277, 278 (N.Y. App. Div. 2000) ("The court properly precluded defendant from recalling a police witness to impeach another witness since defendant failed to lay a sufficient foundation for the testimony. In any event, the court properly determined that the prospective testimony was collateral." (citing People v. Aska, 91 N.Y.2d 979 (1998)) (other citations omitted))—and risk blunting the force of his own cross-examination? It is not reasonably probable that Maria Torres' testimony would have made a difference in the jury's verdict.

Petitioner's burden is to show that the decision of the New York State courts, after appeal and following post-conviction proceedings, was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). Specifically, Petitioner must show that the defense provided by Robert Jaffe, Esquire, "fell below an objective standard of reasonableness" measured under "prevailing professional norms," so much so "that the trial cannot be relied on as having produced a just result." Strickland v. Washington, 466 U.S. 668, 688, 686 (1984). Petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

The district court, in reviewing a petition for a writ of habeas corpus, is not to substitute its own views for the jury's verdict. See Herrera v. Collins, 506 U.S. 390, 401 (1993) ("Federal courts are not forums in which to relitigate state trials." (quoting Barefoot v. Estelle, 463 U.S. 880, 887 (1983))). The question at hand is whether the

14

testimony of one or more of the Ospinas, and of Maria Torres, and of Arturo Soriano, would have changed the verdict, from guilty to not guilty. In order to grant the petition, I must find it reasonably probable that the outcome would so have changed.

I am unable to make that finding. As I have discussed earlier in this opinion, the account of alibi that the Ospinas were ready to give was subject to strong impeachment, and Attorney Jaffe was reasonable in his belief that it could diminish the force of his own impeachments of the prosecution's witnesses.[4]

For the same reasons, and as discussed earlier in this opinion, I make the same findings concerning the witnesses Maria Torres and Arturo Soriano. I find it reasonably improbable that their testimony would have changed the verdict.

Conclusion

I have reviewed the record thoroughly, as supplemented by the affidavits, testimony, and documents presented after the remand from the Court of Appeals. I find that trial counsel's strategy of relying on cross-examination to cast reasonable doubt, and of deciding not to call the alibi witnesses, Maria Torres, or Arturo Soriano, was reasonable in the facts and circumstances of this case. Hence, in my opinion, constitutional error was not committed, and Petitioner enjoyed constitutionally competent counsel.

---

[4] This is not to say that I approve of his inability to account for his investigations (through Ms. Jessie Franklin) of the Ospinas, or of the other witnesses. Like any other fiduciary, defense counsel must be able to explain what he did and did not do in the defense of a client.

15

However, judicial candor must admit a disquiet. The jury struggled in its deliberations, and we cannot be sure that another jury, or a judge, would not have come to an opposite verdict.

Habeas corpus, as limited by the Antiterrorism and Effective Death Penalty Act of 1996, does not provide for review of a jury's verdict because of judicial disquiet arising from the outcome of a trial. A judge hearing a petition for a writ of habeas corpus does not displace the New York Appellate Division or the New York Court of Appeals. The inquiry of a habeas judge is only for constitutional error and, finding none, the inquiry is to be closed.

Accordingly, for the reasons stated, the petition for habeas corpus is denied. I leave for the Court of Appeals whether trial counsel's inability to account for interviewing, or not interviewing, the witnesses, and to explain, in light of the actual facts, the rationale of his trial strategy, warrants appellate review. In light of the prior review of the Court of Appeals and my disquiet about the quality of the trial evidence, I recommend another review by the Court of Appeals, and in that light, I hold that Petitioner has made a substantial showing of the denial of a constitutional right, see 28 U.S.C. § 2253(c), and I therefore certify appealability.

SO ORDERED.

Dated: New York, New York
May 16, 2005

ALVIN K. HELLERSTEIN
United States District Judge